IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

In re

Case No. 06-30709

JOSEPH D. BRANDENBURG

Debtor

MEMORANDUM ON MOTION TO
DETERMINE THAT DEBTOR HAS WAIVED
HIS FIFTH AMENDMENT PRIVILEGE

APPEARANCES:  MAYER & NEWTON
  John P. Newton, Jr., Esq.
  Richard M. Mayer, Esq.
  1111 Northshore Drive
  Suite S-570
  Knoxville, Tennessee 37919
  Attorneys for Debtor

  DONALD K. VOWELL, ESQ.
  6718 Albunda Drive
  Knoxville, Tennessee 37919
  Attorney for Prime Financial Services, Inc.

  JENKINS & JENKINS ATTYS., PLLC
  Edward J. Shultz, Esq.
  800 South Gay Street
  Suite 2121
  Knoxville, Tennessee 37929
  Attorneys for Trustee, W. Grey Steed

  RICHARD CLIPPARD, ESQ.
  UNITED STATES TRUSTEE
  Patricia C. Foster, Esq.
  Suite 114, 800 Market Street
  Knoxville, Tennessee 37902
  Attorneys for the United States Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

Before the court is the Motion to Determine That the Debtor Has Waived His Fifth Amendment Privilege Against Self Incrimination, or in the Alternative, to Determine That the Debtor Has Asserted His Claimed Fifth Amendment Privilege in an Improper Total or Blanket Manner, and Related Relief (Motion) filed by Prime Financial Services, Inc. (Prime Financial) on November 21, 2006. By this Motion, Prime Financial asks the court to (1) determine that the Debtor has waived his Fifth Amendment privilege with respect to all matters disclosed in his Voluntary Petition, statements, and schedules; (2) order the Debtor to answer any and all questions related to these documents at his creditors' meeting held pursuant to 11 U.S.C. § 341 (2005), at any examination held pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, and/or at any other proceeding in this case; and/or (3) determine that the Debtor has improperly attempted a "blanket" assertion of his Fifth Amendment rights and require him to properly invoke any assertion of the privilege.

In response, the Debtor argues that the filing of his statements and schedules does not constitute a waiver of his Fifth Amendment privilege without further participation in the case. He also states that he cannot be required to answer any questions after being advised not to by counsel, due to ongoing state and federal investigations against him by the FBI and Tennessee Attorney General, without waiving his right with respect to other questions. He did not address Prime Financial's argument with respect to the "blanket" assertion, but the law is clear that the Debtor may not validly assert the privilege in that manner.

The record before the court consists of the transcripts from the initial and various adjourned creditors' meetings held on May 16, 2006, July 20, 2006, September 5, 2006, September 26, 2006,

2

October 24, 2006, and November 14, 2006. The focus of this Memorandum relates to questions propounded to the Debtor at the May 16, 2006 initial meeting of creditors and at the adjourned meeting held on November 14, 2006.

I

"No person shall be . . . compelled in any . . . case to be a witness against himself." U.S. CONST. AMEND. V. The purpose of this constitutional privilege is to protect a party or witness against disclosing information that he "reasonably believes could be used in a criminal prosecution [against him] or could lead to other evidence that might be so used." *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1074 (6th Cir. 1990) (quoting *Kastigar v. United States*, 92 S. Ct. 1653, 1656 (1972)). This privilege "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *LeBlanc v. Spector*, 378 F. Supp. 310, 314 (D. Conn. 1974) (quoting *Kastigar v. United States*, 92 S. Ct. 1653, 1656 (1972)).

Before the Debtor may remain silent, he must validly assert his Fifth Amendment rights. "A valid assertion of [this] privilege exists where a witness has reasonable cause to apprehend a real danger of incrimination." *Donovan v. Fitzsimmons (In re Morganroth)*, 718 F.2d 161, 167 (6th Cir. 1983) (citing *Hoffman v. United States*, 71 S. Ct. 814, 818 (1951)). Accordingly, the Debtor must face "a 'real danger,' and not a mere imaginary, remote or speculative possibility of prosecution." *Morganroth*, 718 F.2d at 167 (citing *United States v. Apfelbaum*, 100 S. Ct. 948. 955-56 (1980)). It is then for the court to decide if his silence is justified. *Abbe*, 916 F.2d at 1076 ("[T]he privilege claimant does not initiate [a hearing to determine whether the alleged fears of self-incrimination are

3

legitimate]; rather, it is 'incumbent *upon the trial court* . . . to conduct a particularized inquiry'.") (citations omitted). The court has "broad discretion to determine whether or not the claim to the privilege has merit." *United States v. Gibbs*, 182 F.3d 408, 431 (6th Cir. 1999).

Blanket assertions of the privilege are not sufficient, nor can a witness invoke the privilege before being asked questions. *Morganroth*, 718 F.2d at 167; *see also Gibbs*, 182 F.3d at 431; *United States v. Mahar*, 801 F.2d 1477, 1495 (6th Cir. 1986). "The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety of the refusal to testify." *Morganroth*, 718 F.2d at 167. "[S]ufficient evidence is presented . . . if [the] court can, by the use of reasonable inference or judicial imagination, conceive a sound basis for a reasonable fear of prosecution." *Morganroth*, 718 F.2d at 169. "However, . . . when it is clear that the witness intends to invoke the privilege with respect to any question asked, 'a particularized inquiry by the court would [be] futile.'" *Gibbs*, 182 F.3d at 431 (quoting *United States v. Medina*, 992 F.2d 573, 587 (6th Cir. 1993)). Nonetheless, the Debtor must appear and "object with specificity to the information sought . . . [to permit the] court to rule on the validity of his claim of privilege." *Sec. & Exch. Comm'n v. First Fin. Group of Tex.*, 659 F.2d 660, 668 (5th Cir. 1981). The court will consider whether the Debtor may invoke the privilege "after conducting 'a particularized inquiry, deciding, in connection with each specific area that the questioning party seeks to explore, whether or not the privilege is well-founded.'" *First Fin. Group of Tex.*, 659 F.2d at 668 (quoting *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976)).

After reviewing the transcripts from the § 341 meetings held on May 16, 2006, and November 14, 2006, it does not appear that the Debtor asserted a "per se" blanket assertion. It is true

that at both meetings of creditors, immediately after stating his name for the record, the Debtor's attorney advised that he would be asserting his Fifth Amendment privilege and that he would not answer questions other than those pertaining to his name and address. Nevertheless, the Debtor also expressly stated that he was declining to answer and asserting his Fifth Amendment privilege with respect to each specific question asked. The following is a breakdown of those transcripts:

***Questions asked and not answered at § 341 meeting on May 16, 2006:***[1]

by Chapter 7 Trustee

    1) Have you read and signed your bankruptcy schedules and are they true and accurate to the best of your knowledge? **Privilege asserted**

    2) Are all things of value that you own listed in these schedules? **Privilege asserted**

    3) Have you sold, transferred, or given away any asset worth more than $500.00 in the past year? **Privilege asserted**

    4) Do you have any claims or lawsuits pending against anyone? **Privilege asserted**

    5) Does anyone owe you any money? **Privilege asserted**

    6) Have you discussed the statement of information from the U.S. Trustee's office and feel comfortable that you understood the bankruptcy process? **Privilege asserted**

by creditors

    7) Representing Transport International that has a claim against Extreme Logistics, LLC, and repossessed (inaudible) and nine trailers are the trailers that we're not able to locate. I've sent your counsel a copy of this list (inaudible). I was hoping you could direct us to a person or information that would help us locate these trailers. **Privilege asserted**

---

[1] Many of the questions that were posed by the various creditors were inaudible; however, the record is clear that the Debtor asserted the privilege as to each one.

    8) (inaudible) any debt will be paid. When will those debts be paid?
**Privilege asserted**

    9) Have any fuel (inaudible) been paid? **Privilege asserted**

*Questions asked and not answered at § 341 meeting on November 14, 2006:*

    10) Do you have an employment address? **Privilege asserted**

    11) Have you actually received any type of letter or communication directly from the FBI or the Internal Revenue Service indicating you are in fact the subject of a criminal investigation? **Privilege asserted**

    12) Is everything in your bankruptcy statements true? **Privilege asserted**

Additionally, at the November 14, 2006 meeting of creditors, counsel for Prime Financial submitted to the Chapter 7 Trustee and the Debtor's attorney a list of twenty-nine questions that he had intended to ask, but did not, stating that "there is no point in my asking him any questions," because the Debtor and his attorney both expressly stated that the Debtor would assert the privilege with respect to each question.[2] Many of these questions refer directly to the Debtor's statements and schedules, which are also attached to the November 14, 2006 transcript. Those questions are appended to this Memorandum as Exhibit 1.

Prime Financial contends that by signing his statements and schedules, the Debtor has waived the privilege with respect to the information contained therein. "The Fifth Amendment privilege against self-incrimination is not self-executing. The privilege can be waived by failing to invoke it in a timely fashion and by disclosure of incriminating evidence." *Krasny v. Nam (In re Nam)*, 245 B.R. 216, 227 (Bankr. E.D. Pa. 2000) (citations and footnote omitted). Nevertheless, "a testimonial

---

[2] Although these questions are numbered one through twenty-nine, many contain multiple components resulting in a series of questions far exceeding twenty-nine.

waiver will not be lightly inferred[, and] the court must indulge every reasonable presumption against finding testimonial waiver." *Teitelman v. Dale Petroleum Corp. (In re A&L Oil Co., Inc.)*, 200 B.R. 21, 24 (Bankr. D.N.J. 1996). Furthermore, "[a]lthough disclosure of an incriminating fact generally waives the privilege as to details, waiver does not occur where further disclosure carries a risk of incrimination beyond that raised by previous testimony." *United States v. Lariche*, 549 F.2d 1088, 1096 (6th Cir. 1977).

Prime Financial cites *In re Cotillion Inv., Inc.*, 343 B.R. 344, 356 (Bankr. S.D. Fla. 2006), in support of its argument. The *Cotillion* case involved the questioning of the debtor's president, its sole principal, at a Rule 2004 examination, and the court found that she could not claim a Fifth Amendment privilege as to information in the debtor's statements and schedules that she signed under oath. Additionally, the *Cotillion* court also stated that her waiver applied only to information actually referenced in those documents. *Cotillion Inv., Inc.*, 343 B.R. at 356 n.5.

"[T]he mere filing of [bankruptcy schedules] did not constitute a waiver of the right to stop short whenever the bankrupt could fairly claim that to answer might tend to incriminate him." *Arndstein v. McCarthy*, 41 S. Ct. 26 (1920). A debtor may assert Fifth Amendment rights at a § 341(a) meeting of creditors. *See e.g., In re French*, 127 B.R. 434, 436 (Bankr. D. Minn. 1991); *In re Hulon*, 92 B.R. 670, 674 (Bankr. N.D. Tex. 1988). However, because the debtor is "entitled to invoke the privilege only to genuinely threatening questions[, he is] therefore . . . required to take the oath and listen to each question propounded by the trustee." *Hulon*, 92 B.R. at 675. If a debtor wishes to assert the Fifth Amendment at a meeting of creditors, he must make the assertion "to each question which would require a potentially self-incriminating answer." *French*, 127 B.R. at 435.

7

Furthermore, although the Debtor is entitled to plead the Fifth Amendment with respect to any information that he reasonably believes presents a real danger of incrimination, the court may nevertheless draw negative inferences from his doing so. *Fed. Trade Comm'n v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof."); *Banknorth N.A. v. Vrusho (In re Vrusho)*, 321 B.R. 607, 612 (Bankr. D.N.H. 2005). In the bankruptcy context, dismissal may be appropriate.

> Although individuals have the right to assert the Fifth Amendment, there may be consequence to such assertion. By filing this bankruptcy proceeding, the Debtors have put their assets, liabilities, income and expenses at issue for creditors and the Court to review. A creditor has the right to inquire as to these matters. The IRS was within its rights to inquire into these matters at a 2004 examination. The Debtors' refusal to provide information, even under the assertion of the Fifth Amendment, is grounds for the dismissal of this bankruptcy proceeding.

*In re Wisler*, 2000 Bankr. LEXIS 1971, at *8 (Bankr. S.D. Ind. Nov. 30, 2000).

In this case, it appears that the Debtor, by voluntarily filing his bankruptcy schedules, did waive his Fifth Amendment privilege with respect to questions concerning the statements and schedules themselves, as well as specific questions concerning specific information contained in the statements and schedules. However, if the court finds that the Debtor reasonably fears prosecution, he would not be required to give any details beyond the information expressly set forth in the statements and schedules. Thus, any "follow-up" questions would be subject to the privilege.

II

The court has thoroughly reviewed the twelve questions propounded to the Debtor at the May 16, 2006, and November 14, 2006 creditors' meetings by the trustee and creditors, excluding Prime Financial, as detailed herein at pages 5 and 6, and has reviewed the twenty-nine questions[3] the Debtor did not answer at the November 14, 2006 adjourned meeting of creditors propounded to him by counsel for Prime Financial. The court finds the Debtor's assertion of his Fifth Amendment privilege appropriate to many questions and inappropriate to others. While counsel for Prime Financial did not specifically ask the Debtor questions at the November 14, 2006 adjourned creditors' meeting, but, in reliance upon the Debtor's representation that he would assert the privilege when asked any question, filed the list of questions set forth on Exhibit 1, the court will nonetheless address these questions. Should Prime Financial's counsel seek to specifically ask the Debtor these same questions at a future meeting in order to elicit a direct response, he is certainly entitled to do so.

With the regard to the questions asked the Debtor at the May 16, 2006, and November 14, 2006 creditors' meetings, the court finds no basis for the Debtor's assertion of his Fifth Amendment privilege as to the following questions:

1) Have you read and signed your bankruptcy schedules?

4) Do you have any claims or lawsuits pending against any one?

6) Have you discussed the statement of information from the U.S. Trustee's Office and feel comfortable that you understood the bankruptcy process?

---

[3] *See supra* n. 2.

9

10) Do you have any employment address?

11) Have you actually received any type of letter or communication directly from the FBI or the Internal Revenue Service indicating you are in fact the subject of a criminal investigation?

In the court's mind, each of these questions, as well as those discussed below with respect to Prime Financial, is, at least on the surface, innocuous and the answers pose no risk of self-incrimination. Clearly, questions 1) and 4) address matters of public record. The court recognizes, however, that Debtor's counsel has a comprehensive feel for the Debtor's legal situation well beyond that possessed by the court. Therefore, if the Debtor and his counsel, in good faith, persist in their belief that he is entitled to assert the privilege as to any of those questions, that assertion should be supported by something more than just the bare bones claim to the privilege. In other words, some explanation for the claim to the privilege should be given.

As to the remaining portion of question 1) ("[Are [your bankruptcy schedules] true and accurate to the best of your knowledge?") and as to questions 2), 3), 5), and 12), the court finds the Debtor to have validly asserted the privilege. Questions 7), 8), and 9) are incomplete and ambiguous, and the court is unable to make a finding regarding the propriety of the Debtor's assertion of the privilege as to these questions.

As to the questions propounded the Debtor in writing at the November 14, 2006 adjourned creditors' meeting by Mr. Vowell, Prime Financial's attorney (Exhibit 1), the court finds that the Debtor's assertion of the Fifth Amendment privilege was not appropriate as to the following questions:

    1),
    2),
    3) (but only as to the question "What is your current address?"),
    4),
    17), and
    23) (but only as to the question "How much money have you paid your bankruptcy attorney?")

The court finds the Debtor's assertion of the privilege to all other questions on Exhibit 1 to be valid. Again, if Prime Financial desires to specifically propound these questions to the Debtor at a further adjourned meeting of creditors to obtain his response on the record, it may do so.

Finally, the parties must realize that the court's finding that the Debtor did not validly assert his Fifth Amendment privilege to certain questions has application *only* to the specific questions asked or, in the case of Prime Financial, posited in Exhibit 1. Follow-up questions and additional questions are subject to the Debtor's assertion of the privilege within the parameters set forth in this Memorandum.

Given that the Debtor has a constitutional right to asset his Fifth Amendment privilege against self-incrimination and the fact that he has chosen to exercise that right, suggests to the court that further questioning of the Debtor is going to prove unproductive. Nonetheless, if Prime Financial, the Trustee, or any other party in interest seeks to ask the Debtor additional questions to which he asserts his Fifth Amendment privilege, and a party seeks to compel the Debtor's response, it may do so through the filing of an appropriate motion to compel to which it shall append a certified copy of the transcript setting forth the question and response. The court will, after providing a seven-day response time, rule on such motion without a hearing.

An order granting Prime Financial's Motion in part and denying the Motion in part, as set forth in this Memorandum, will be entered.

FILED: January 10, 2007

                                    BY THE COURT

                                    *RICHARD STAIR, JR.*

                                    RICHARD STAIR, JR.
                                    UNITED STATES BANKRUPTCY JUDGE

Question Areas for Joseph D. Brandenburg
Submitted by Prime Financial Services, Inc., and Fleet One
Meeting of Creditors
Nov. 12, 2006

**Date of Bankruptcy Filing: April 7, 2006**

1. What is your name?

2. Are you the debtor in this case?

3. What is your current address? Who else lives there besides yourself?

4. [Exhibit 1: Copy of bankruptcy petition, statement, schedules, etc.] Is this your signature? Did you read this before you signed it? Including:

    a. Statement of Financial Affairs

    b. Schedules of Real Property

    c. Schedule of Personal Property

5. Are all of your answers true and correct? Did you tell the truth in each and every answer? Did you answer falsely on any of the questions in your bankruptcy schedules?

6. On the day you filed bankruptcy did you have any other property that you didn't list on your bankruptcy schedules?

7. **Question 1 and 2 (income):** In the two years before you filed bankruptcy, did you have any income not listed in your answer to Questions 1 and 2?

8. Cash Mr. Brandenburg may have gotten prior to bankruptcy filing:

    a. [Exhibit 2: check] Did you get a check for $12,200.89 from Tennessee Koyo on March 14, 2006? [before the bankruptcy filing] Did the money come into your personal possession? Did you list that on your bankruptcy schedules in any way? Either as an asset or as income? What did you do with it?

    b. [Exhibit 3: check] Did you get a check for $11,377.40 from TAMKO on March 16, 2006? [before the bankruptcy filing] Did the money come into your personal possession? Did you list that on your bankruptcy schedules in any way? Either as an asset or as income?

    c. [Exhibit 4: copy of check] Did you get a check for $6,960.71 from Tennessee Koyo a few weeks before bankruptcy? Isn't it a fact that you got this money?

    d. [Exhibit 5: bill of sale for backhoe] Did you sell a Caterpillar 416B backhoe and a 16 ton trailer on March 20, 2006? [before the bankruptcy filing] For $17,000? Did you get the $17,000 in your personal possession? Did you list that on your bankruptcy schedules in any way? Either as an asset or as income? What did you do with it? Did you spend it on yourself

**EXHIBIT 1**

or your family? Did you spend it before the bankruptcy filing, or did you still have it at the bankruptcy filing? Did you keep it hidden during the bankruptcy filing?

9. **Question 7 (gifts):** Are you sure that you didn't make any gifts or charitable contributions in the year before your bankruptcy filing? What about gifts to "Haven Ministries?" Exactly what is Haven Ministries? Is it a qualified religious or charitable entity or organization? Or is it just a bank account of yourself or your wife Ericka Brandenburg? And in making contributions to Haven Ministries were you just giving money to your wife Ericka Brandenburg? Did you give 10% of your income to "Haven Ministries?" Itemize any and all payments that you have made to or relating to Haven Ministries in the year preceding bankruptcy.

10. **Question 10 (other transfers):** Are you sure you didn't make any transfers to Shane McCool in the two years before bankruptcy?

    a. To your wife Ericka Brandenburg?
    b. To Gayla Lemmons?
    c. To Michelle Richards?
    d. To anybody else?
    e. Of a 1997 Caterpillar 416B Backhoe?

11. Have you concealed property from the Trustee in bankruptcy? Are you concealing any property from the Trustee in bankruptcy?

12. Have you sold any assets of the bankruptcy estate since you filed bankruptcy?

13. What income have you had since the bankruptcy filing?

14. Since your bankruptcy filing, have you had any bank accounts in your name?

15. Have you been involved in selling things on Ebay since the bankruptcy filing? Where did you get the items sold, and what was the source of funds to purchase the items sold?

16. Regarding Haven Ministries:

    a. What is it?
    b. How are you involved with it?
    c. What bank accounts are there related to Haven Ministries?
    d. What funds were in the Haven Ministries account(s) as of the day of filing bankruptcy?

17. You listed a number of companies in your answer to Question 18 and in Schedule B, item 13. You said that debts exceed assets on all businesses. What were the debts and assets of each company?

    a. Extreme Properties LLC

    b. Extreme Leasing Corp

    c. Extreme Brokerage Corp

18. Have you sold things belonging to these companies this year? Was that before or after your bankruptcy filing?

19. Were you involved in setting up another trucking company called Extreme Logistics LLC this year? Was that in Olathe Kansas? Was that before or after your bankruptcy filing? What was your involvement? Did you put any money into it? How much money did you put into it? Where did you get the money that you put into it? What was the date the company was set up and what was the date that you put money into it? What other people were involved and what is their contact information?

20. Were you involved in setting up another trucking company called AST Brokerage, Inc. (or similar name) this year? Was that in Lyons Kansas? Was that before or after your bankruptcy filing? What was your involvement? Did you put any money into it? How much money did you put into it? Where did you get the money that you put into it? Where did you get the money that you put into it? What was the date the company was set up and what was the date that you put money into it? What other people were involved and what is their contact information?

21. Have you started any other new business using funds or assets that you held at the time of filing bankruptcy, but did not list in your bankruptcy schedules?

22. After your bankruptcy filing:

    a. Did you sell three 7 x 16 enclosed white trailers [$7,100] and a small generator [$150] in May of 2006? Were they sold to Jeff Lee? Did you sell the trailers for $7,100? Did you sell the generator for $150? Where did you get these items? Did you have these things when you filed bankruptcy? Did you fail to list them on your schedules? What did you do with the proceeds of sale?

    b. Have you sold tools and equipment since the bankruptcy filing? Including on Ebay? Where did you get them? What happened to the money?

        i. Including concrete finishing equipment for $17,000

        ii. Including pop-up camper for $3,600

        iii. Several compressors

        iv. 4 wheel vehicles

    **c. Exhibit 6:** [Copy of check] Did a check in the amount of $39,231.48 check from Barksdale Bonding & Insurance written on May 3, 2006, come into your hands since you bankruptcy filing? When did you get this check? What did you do with it? Did you deposit it into a bank account? If so, what bank account did you deposit it into? And when did you deposit it? Did you end up getting a cashier's check for $39,231.48 payable to Prime Financial? What was the source of funds for this cashier's check? If it was

3

a check what bank account was the check written on? Did your attorney try to send the cashier's check to Prime Financial on Aug. 23, 2006? Why did you keep the money for nearly four months before trying to send it to Prime Financial? What did you do with the money while it was in your hands? Did you then get a replacement cashier's check in the same amount? And did your attorney then give the replacement cashier's check to Prime Financial on Oct. 17, 2006?

23. How much money have you paid your bankruptcy attorney? Itemize each attorney and the date of payment and state whether paid by check or cash and the bank account and check number of each check. What was the source of funds for those payments? Did you pay him from the proceeds of assets that you held at the time of bankruptcy? Did you pay him with assets that were not shown on your bankruptcy schedules?

24. How much money have you paid other attorneys this year? Itemize each attorney and the date of payment and state whether paid by check or cash and the bank account and check number of each check and the reason the attorney was employed. State the source of funds for each payment. Specifically, did you pay any attorney from the proceeds of assets that you held at the time of bankruptcy? Itemize any such payments. Specifically, did you pay any attorney with assets that were not shown on your bankruptcy schedules? Itemize any such payments.

25. What bank accounts did you have at the time of filing bankruptcy? What additional bank accounts do you have right now?

26. Have you been involved in selling any heavy equipment this year, including backhoes or similar equipment? If so, give the particulars including a description of the item sold, the name of the owner, who each item was sold to and the consideration or payment for the item, and the disposition of the sale proceeds.

27. Have you ever been arrested? Identify each time you were arrested, including when and where and what you were charged with, and state the disposition of the case.

28. For every question that you have refused to answer on grounds that it might tend to incriminate you (Fifth Amendment to the United States Constitution), identify the criminal charge that you are concerned with.

29. Isn't it a fact that the criminal charge that you are concerned with in some cases in which you have refused to answer is a Federal bankruptcy crime? Identify such question(s), that is, identify every question that you have refused to answer on the grounds that it might tend to incriminate you of a Federal bankruptcy crime.

4